## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Center For Environmental Advocacy; Sierra Club; and Northeastern Minnesotans For Wilderness, | Civil No. 10-2178 (SRN/LIB) |

Plaintiffs,

**MEMORANDUM OPINION
AND ORDER**

v.

United States Forest Service, an agency
of the U.S. Department of Agriculture;
Kent Connaughton, Regional Forester for
the Eastern Region, in his official
capacity; James Sanders, Forest
Supervisor for the Superior National
Forest, in his official capacity; and
United States Fish and Wildlife Service,
an agency of the U.S. Department of the
Interior,

Defendants.

_____

Stephen J. Snyder, Snyder & Snyder, P.A., 100 South Fifth Street, Suite 410,
Minneapolis, MN 55402; Marianne Dugan, 259 E. 5th Ave., Suite 200-D, Eugene, OR,
97401; and Sean Malone, 624 W. 24th Ave., Eugene, OR, 97405, for Plaintiffs.

David W. Fuller, and Ann M. Bildtsen, Asst. U.S. Attorneys, U.S. Attorney's Office, 300
South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendants.

_____

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the parties' cross motions for summary

judgment (Doc. Nos. 44 & 60).  For the reasons stated below, this Court denies the

motion of Plaintiffs Minnesota Center For Environmental Advocacy, Sierra Club and

Northeastern Minnesotans For Wilderness and grants Defendants' motion.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The National Forest Management Act of 1976 (the "NFMA") "directs the

Secretary [of Agriculture] to 'develop, maintain, and, as appropriate, revise land and

resource management plans [LRMPs] for units of the National Forest System.'"  Sierra

Club v. Robertson, 28 F.3d 753, 755 (8th Cir. 1994).  "An LRMP must establish the

overall management direction for the forest unit for ten to fifteen years.  Thus, an LRMP

is, in essence, a programmatic statement of intent that establishes basic guidelines and

sets forth the planning elements that will be employed by the Forest Service in future site-

specific decisions."  Id.  The NFMA, "by direct or indirect reference," incorporates the

"myriad concurrent statutes or regulations" with which the Forest Service must comply.

Id.  For example, a LRMP "must be developed in compliance with the National

Environmental Policy Act (NEPA)."  Id.

Once a LRMP is approved, "individual site-specific projects are proposed and

assessed using the LRMP."  Id.  Under the NFMA,

> [r]esource plans and permits, contracts, and other instruments for the use
> and occupancy of the National Forest System lands shall be consistent with
> the land management plans.  Those resource plans and permits, contracts,
> and other such instruments currently in existence shall be revised as soon as
> practicable to be made consistent with such plans.

16 U.S.C. § 1604(I).  "The Forest Service must ensure that all projects are consistent with

the plan."  Robertson, 28 F.3d at 755.

Pursuant to the requirement of the NFMA, in July 2004, the United States Forest

Service (the "USFS," "Forest Service" or "Service") published the Land and Resource

2

Management Plan for the Superior National Forest ("SNF") in northeastern Minnesota.[1]

This Management Plan (the "Forest Plan," or "Plan") "established desired conditions,

objectives, standards, and guidelines for recreation and roads management, including for

unclassified roads" and Off-Highway Vehicles ("OHVs").[2]  (Doc. No. 61, at 4.)  The Plan

"provides a framework and context that guides" day-to-day management of the SNF.

(Forest Plan, at 1-8.)  "It is a strategic, programmatic document and does not make

project-level decisions."  (Id.)  Another federal statute "requires that the national forests

'be administered for outdoor recreation, range, timber, watershed, and wildlife and fish

purposes.'"  Robertson, 28 F.3d at 755.  Thus, as Defendants recognize, federal law

"mandates that the USFS manage the SNF to provide multiple uses and balance divergent

interests."  (Doc. No. 61, at 4.)[3]

"Prior to 2004, the Forest Plan allowed ATVs to travel not only on low standard

forest roads, but . . . also to travel cross-country or throughout the national forest, even

where there were no roads."  (FF0003979.)  The 2004 Forest Plan "made several

decisions on the use of off-road vehicles and laid the groundwork for more decisions to

---

[1]    The Plan has been upheld as not in violation of NEPA.  Sierra Club v. Kimbell, 595 F. Supp. 2d 1021 (D. Minn. 2009), aff'd, 623 F.3d 549 (8th Cir. 2010).

[2]    OHVs, also known as recreational motorized vehicles (RMVs), include all-terrain vehicles (ATVs) and off-highway motorcycles (OHMs).  (Doc. No. 61, at 4 & n.5.)

[3]    The SNF includes the Boundary Waters Canoe Area Wilderness ("BWCAW").  The BWCAW "emphasizes non-motorized recreation, while the national forest outside of BWCAW includes both motorized and non-motorized recreation." (Doc. No. 61, at 3.)

be made in the future." (Id.)  First, it prohibited cross-country travel. (Id.)  Second, "[o]n

September 10, 2004, the Forest Supervisor issued an order listing which roads were open

and which roads were closed to ATVs.  A map showing these roads was distributed and

has been revised on an annual basis.  This resulted in approximately 1522 miles of roads

being open to ATV use and approximately 1311 miles of roads being closed to ATV use.

Of these approximately 244 miles of unclassified roads were open for ATV use." (Id.)

In November 2005, the Service published its final rule governing "Travel

Management; Designated Routes and Areas for Motor Vehicle Use" (the "Travel

Management Rule").  70 Fed. Reg. 68264-01, 2005 WL 2986693.  The rule amended the

regulations which, as relevant here, govern the designation of roads, trails and areas for

motor vehicle use in national forests.  36 C.F.R. Part 212, Subpart B.  "The rule intends to

restrict motor vehicles to designated roads and trails and requires national forests to

designate those roads, trails, and areas that are open to motor vehicle use." (FF0003979.)

"The rule required that any road or trail where motorized use was to be allowed would

now have to be part of a national forest system road or trail, and unclassified roads would

have to either be designated as system roads or trails or to be decommissioned." (Id.)  In

addition, the "Forest Service requires that temporary roads and trails be decommissioned

once the emergency that justified them or their written authorization is no longer in

effect."  70 Fed. Reg. at 68277, 2005 WL 2986693.  Under the Rule, each national forest

must prepare and publish a map showing which roads are designated for motorized use.

See 36 C.F.R. § 261.13.

In December 2008, the Forest Service, pursuant to the requirements of NEPA, issued an Environmental Assessment ("EA") of its proposed Forest-wide Travel Management Project for the SNF ("TMP" or "Project").  The EA summarized four alternatives:  (1) a "no action alternative" designed to continue "the current situation and management with regard to unclassified roads and OHV uses on the forest"; (2) the "Modified Proposed Action," which "would make decisions on unclassified roads, either decommissioning them, or converting them to national forest system roads, trails or special use roads"; (3) "Alternative 3," which would provide "additional loop and connected riding opportunities" as well as "additional short spurs for OHV riding"; and (4) "Alternative 4," which "still emphasizes loop opportunities," but "reduces the mileage available for OHV use, especially short spurs routes and conversion of snowmobile trials to ATV trails."  (FF0003993-94.)

In November 2009, the Forest Service published its "Decision Notice and Finding of No Significant Impact" ("DN/FONSI"), on the "Forest-wide Travel Management Project" on the SNF, a decision to reclassify the system of roads and trails within the SNF and the types of vehicles that may use particular roads and trails.  The Project elected to implement, out of the four options described in the EA, "Alternative 2 Modified" (the "proposed alternative").  (FF0004818.)[4]  "The decision applies only to national forest

---

[4]     The "modification" to the original Alternative 2 is essentially irrelevant here.  Alternative 2 Modified "is identical to the decision made on December 16, 2008" except that it closed to OHV use a portion of Forest Road 152.  The Service's original December 16, 2008 decision was appealed.  On March 30, 2009, the Appeal Deciding Officer upheld the original decision with one exception not relevant here.

lands within the Forest Purchase Unit boundaries, but outside the [BWCAW]." (Id.) In

addition, the Forest Service's "Decision Notice" included a "Finding of No Significant

Impact," a finding that meant the Service need not prepare an Environmental Impact

Statement (EIS).

The purpose of the Project was "to determine which roads and trails on the [SNF]

are to be available for public motorized use, including highway vehicles . . ., all terrain

vehicles (ATVs), off-highway motorcycles (OHMs), and unlicensed off-road vehicles."

(FF0003978.)  The EA identified two purposes of the Project:

1.   Designating or decommissioning unclassified roads . . . [and]
2.   Providing loop routes and connections for longer distance riding
     opportunities on existing roads and trails that provide for enjoyable and
     consistently managed Off-highway Vehicle (OHV) riding experiences.

(FF0004817.)  The Project did not create a new OHV road and trail system, but rather

"adjust[ed]" the existing system.  (Id.)  "Of the almost 1600 miles of roads currently open

to OHVs," the Project made a decision "on OHV use on about 37 percent of those roads

(about 596 miles)."  (FF0004826.)

In particular, by choosing Alternative 2 Modified, the Project intended to

"decommission 154 miles and designate 142 miles of unclassified roads."  (Id.)  The

Forest Supervisor reasoned that under his decision, "overall negative impacts to natural

resources will be less than is occurring now or would occur under the No Action

Alternative" because the selection of Alternative 2 Modified "results in fewer total roads"

and would place "most additional OHV use" on "higher standard roads."  (FF0004835.)

He concluded that "all action alternatives result in fewer total roads" and "more roads that

will be decommissioned than in the no action alternative." (FF0004835-36.) He thus stated that "there is a net reduction of 108 miles of motorized use on the" SNF. (FF0004836.) Accordingly, "not only is it appropriate to select Alternative 2, it represents an improvement over the No Action Alternative." (Id.)

After the administrative appeals were largely denied, Plaintiffs then filed their Complaint against the Forest Service and two of its individual officials, and the Fish and Wildlife Service ("FWS"), seeking declaratory and injunctive relief. (Doc. No. 1.) Plaintiffs later filed their First Amended Complaint. (Doc. No. 10.) Plaintiffs allege that USFS violated the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), the Wilderness Act (WA), and two Executive Orders (and a related regulation) regulating off-road vehicle use on public lands. Plaintiffs also allege that the FWS violated the Endangered Species Act (ESA) with respect to its consultation with the USFS regarding the Canada lynx. The First Amended Complaint asserts thirteen counts: (1) three claims for violation of NEPA (Counts I-III); (2) one claim for violation of NFMA (Count IV); (3) one claim for violation of WA and the Boundary Waters Canoe Area Wilderness Act (Count V); (4) two claims for violation of Executive Orders and Forest Service Regulations (Counts VI & VII); and (5) six claims for violation of the Endangered Species Act (Counts VIII-XIII). (Id.)

The parties now cross-move for summary judgment.[5]

---

[5] Although Plaintiffs have not briefed all of the Counts asserted in their First Amended Complaint, Defendants seek summary judgment on "all counts" in the Amended Complaint and a disposition of the entire action. (Doc. No. 61, at 52, 2.)

II.     **DISCUSSION**

A.      **Administrative Review and Summary Judgment Standard**

The agencies' actions are reviewed under the Administrative Procedure Act

("APA"), "which provides that a 'reviewing court shall . . . hold unlawful and set aside

agency action, findings and conclusions found' not to meet six separate standards."

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413 (1971).  "In all cases

agency action must be set aside if the action was 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law,' or if the action failed to meet

statutory, procedural or constitutional requirements."  Id. at 413-14 (quoting 5 U.S.C. §

706(2)(A)-(D)).[6]  "In applying that standard, the focal point for judicial review should be

the administrative record already in existence, not some new record made initially in the

reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973).

With respect to the "arbitrary and capricious" component of the administrative

review standard, a reviewing court must set aside an agency's decision or action if

> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence
> before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Although this ultimate standard of review is a "narrow one," the reviewing court's inquiry

---

[6]      The two remaining standards of the six enumerated by Section 706(2), that
is Subsections 706(2)(E)-(F), apply only in "certain narrow, specifically limited
situations" not relevant here.  Volpe, 401 U.S. at 414 & n.30.

into the surrounding facts must be "searching and careful." Volpe, 401 U.S. at 416. The

agency must "articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choice made,'" and this Court must "consider

whether the decision was based on a consideration of the relevant factors and whether

there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

Deference to an agency's decision "has not come so far that we will uphold regulations

whenever it is possible to 'conceive a basis' for administrative action." Bowen v.

American Hosp. Ass'n, 476 U.S. 610, 626 (1986) (plurality).

But in actions reviewed under the arbitrary and capricious standard, an "agency's

decision enjoys a 'high degree of deference.'" Sierra Club v. Bosworth, 352 F. Supp.2d

909, 917 (D. Minn. 2005) (quoting Sierra Club v. EPA, 252 F.3d 943, 947 (8th Cir.

2001)). And a reviewing court is "not free to substitute [its] judgment for that of the

agency." Friends of the Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1128

(8th Cir. 1999). If a decision "requires the weighing of a number of relevant factors,

including the extent of the interrelationship among proposed actions and practical

considerations of feasibility," the issue therefore demands "a high level of technical

expertise and is properly left to the informed discretion of the responsible federal

agencies." Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).

The administrative record establishes the facts in an action seeking judicial review

of agency action. Camp, 411 U.S. 142. "Accordingly, there are no genuine issues of

material fact and these issues are suitable for disposition through summary judgment."

South Dakota v. United States Dept. Of Interior, 401 F. Supp. 2d 1000, 1004 (D.S.D.

2005).  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).

### B.       Framing The Debate And The "No-Action Alternative"

Much of this dispute revolves around what properly constitutes a "No Action"

alternative, and how the other options–most importantly, that chosen by the Service to be

implemented in the TMP–therefore compare to taking "no action."  That underlying

dispute involves the parties' disagreement over the various types of roads and trails at

issue and how the TMP would alter such travelways.  Each side contends that the other's

position rests on "false premises."  (Doc. No. 66, at 7; Doc. No. 67, at 5.)  The existing

network of roads and trails, however, is not entirely the result of any official agency

action or decision.  As Defendants assert, the "SNF contains a vast road network . . . .

dating back to the 1800s."  (Doc. No. 61, at 3.)  "Over the years[,] some roads have

become unused and are now barely discern[i]ble, while others continue to be used for

access to resources, recreation, and rural transportation due to a mixed ownership

pattern."  (Id.)

In addition, both sides recognize that apart from whatever action the Forest Service

might take with respect to the designation and decommissioning of roads and trails, short

of eliminating all use of recreational vehicles, the increasing popularity of OHV riding in

the SNF, a reality independent of any of the four Alternatives under consideration, will

likely continue.  Thus, the ultimate environmental impact under the "no action"

alternative, and indeed the impact under any alternative, is not predictable with any

precision because all of the proposals are analyzed in terms of the single variable of the

number of miles of roads and trails designated for various types of use.  Other variables,

however, will also contribute to the overall environmental impact.  These include the

growing popularity of OHV use in the SNF (and elsewhere) and the frequency and

intensity of use of the designated trails.

   At the outset, the Court must address Plaintiffs' position that the No-Action

Alternative as articulated by Defendants fails to correctly represent the true baseline or

benchmark from which the various Action Alternatives should be evaluated.  At bottom,

Plaintiffs contend that a true No-Action Alternative must reflect–as required by the 2005

Travel Management Rule–the decommissioning of all "unclassified" roads, at least those

no longer in use.  (Doc. No. 66, at 7-18.)[7]

---

[7]    Defendants observe that the 2004 Forest Plan was "upheld in all respects"
by the district court and the Eighth Circuit in Sierra Club v. Kimbell, 595 F. Supp. 2d
1021 (D. Minn. 2009), aff'd, 623 F.3d 549 (8th Cir. 2010).  (Doc. No. 67, at 8 n.2.)  They
then contend that the "definition of unclassified roads (or the distinction between
unclassified and temporary roads) was not contested in the Forest Plan litigation."  (Id.)
"The Forest Plan was upheld in all respects, and Plaintiffs may not object to it now."  (Id.
at 35.)  But in Kimbell, the issue only concerned "the *first stage* of the forest planning
process" for the SNF, that is, whether the Forest Service, when issuing the 2004 Forest
Plan, "complied with NEPA by evaluating adequately the impacts of the different
management scenarios on the BWCAW."  623 F.3d at 554, 558 (emphasis added).  The
second stage of forest planning is the implementation of "individual site-specific
projects" such as the 2009 Project at issue here.  Robertson, 28 F.3d 753, 755 (8th Cir.
1994).  Moreover, "NEPA does not establish rules governing the substantive content of
forest plans.  Instead, NEPA's mandate 'is essentially procedural.'"  Kimbell, 623 F.3d at
559.  Finally, "[r]oads analysis and environmental analysis must be performed at the
                                                                    continue...

But the 2005 Rule provides only that "*temporary roads and trails*" will be "decommissioned once the emergency that justified them or their written authorization is no longer in effect."  70 Fed. Reg. at 68276 (emphasis added); accord id. at 68281.  That process of decommissioning, however, is not underway, much less completed.  Moreover, it is not clear that such a process could occur outside of the context of a "project" such as the 2009 Project at issue here.  According to the Forest Service Manual, "[r]oads analysis and environmental analysis *must be performed at the project level* to determine if an unclassified road should be added to the system, converted to a trail, or decommissioned." (FWS0002615 (emphasis added).)  And under the 2004 Forest Plan, "'decisions will be made on Forest unclassified roads to designate them as a National Forest System road or trail or to decommission them.'"  (Doc. No. 61, at 4-5 (quoting Forest Plan, Objective O-TS-6, at 2-49).)  And as these statements disclose, an "unclassified road" need not be decommissioned, but rather may be "*added to* the system."  (Id. (emphasis added).)  Thus, Plaintiffs' contention that "temporary roads and unclassified roads constitute a distinction without a difference" (Doc. No. 54, at 43 n.9) is plainly untenable.

In addition, one of the proposed alternatives initially considered was to "[d]ecommission all unclassified roads."  (FF0004012.)  The Service decided not to

---

[7]...continue
*project level* to determine if an unclassified road should be added to the road system, converted to a trail, or decommissioned."  (FWS0002615 (emphasis added).)  Thus, the Court rejects any argument of Defendants that Plaintiffs waived their present right to challenge the environmental impacts of the 2009 "project-level" TMP in terms of the various road definitions at issue.  The Court clarifies, however, that it is not now reviewing those definitions as articulated in 2004 Forest Plan.

analyze this alternative in detail because the use of designated SNF roads for "recreation purposes" is valid and one of several criteria to consider when deciding to decommission a road. (Id.) The Service determined that "[d]ecommissioning all unclassified roads on an a priori basis without considering these multiple criteria would not meet the purpose and need of this project and would not satisfy the objective of the 2004 Forest Plan" to allow recreational vehicle use on "existing unclassified, OML 1 and OML 2 roads." (Id.)

Regarding temporary roads no longer in use, Plaintiffs have identified nothing in the record disclosing that some of the unclassified roads that the Project seeks to designate for OHV use are temporary roads, much less temporary roads no longer in use. Whatever Plaintiffs contend should be done with such "leftover" temporary roads, the fact remains that some temporary roads presently remain accessible even though the use for which they were created has since ceased. The status quo thus includes these roads. And the "status quo" may "properly be the no action alternative." Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1188 (9th Cir. 1997).

## C. The NFMA Claims

With respect to the National Forest Management Act (NFMA), Plaintiffs allege that the present Project violates four Standards published in the 2004 Forest Plan. As noted above, all projects "shall be consistent with the land management plans." 16 U.S.C. § 1640(I). "All site-specific decisions, including authorized uses of land, must be consistent with the applicable plan." 36 C.F.R. § 219.10.[8]

---

[8] The 2004 Forest Plan articulates various "Goals, Desired Conditions, and
continue...

### 1.    S-WL-4

Plaintiffs contend that the Project violates Forest Plan Standard S-WL-4 "because [the Project] fails to '[c]lose temporary and low standard roads as soon as their intended purpose has been achieved.'"  (Doc. No. 54, at 43 (quoting S-WL-4).)  Instead, they argue, "the Project makes <u>permanent</u> many miles of these roads."  (<u>Id.</u> (emphasis in original).)  They assert that the "standard requires closure of <u>both</u> 'temporary and low standard roads.'"  (<u>Id.</u> (emphasis in original) (further contending that the distinction between them is one "without a difference").)  Thus, according to Plaintiffs, while "71 miles of 'low standard roads and trails [would be] open to ATV/OHMs" under the No Action alternative, "an astounding 528 miles of 'low standard roads and trails [would be] open to ATV/OHMs'" under the alternative selected by the Forest Service.  (<u>Id.</u> at 43-44.)

S-WL-4 provides that "[m]anagement activities for the gray wolf will be governed by [the] Recovery Plan for Eastern Timber Wolf (1992)" (the "Recovery Plan").  The "Road Management Guidelines" of the Recovery Plan, in turn, provides that one of the

---

[8]...continue
Objectives."  (Forest Plan, at 1-7.)  The Plan also articulates various "Standards and Guidelines."  (Forest Plan, at 1-8.)  "Goals and desired conditions are broad statements that describe" what the Service "will strive to achieve," but are "not measurable" and "are not absolutes."  (Forest Plan, at 1-7.)  "Objectives are measurable steps taken within a specified timeframe to move towards a desired condition," but are "not 'targets.'"  (Forest Plan, at 1-8.)  In contrast, "standards and guidelines are the specific technical direction for managing resources."  (<u>Id.</u>)  In particular, "[s]tandards are required limits to activities" that "ensure compliance with laws, regulations, executive orders, and policy direction."  (<u>Id.</u>)  And the chosen alternative of any particular project must comply with the governing plan's stated "Standards."  Thus, the applicable standard of review with respect to Plaintiffs' allegations that the 2009 SNF Project violates particular Standards of the 2004 Plan is essentially a question of whether the Project is "not in accordance with law."  5 U.S.C. § 706(2)(A).

"guidelines" that "should be *considered* by . . . land management agencies" is to "[c]lose

temporary and low standard roads as soon as their intended purpose has been achieved."

(FWS0000373 (emphasis added).)  Defendants thus argue that while "S-WL-4 is

mandatory," "*non*-mandatory suggestions contained in the Wolf Recovery Plan do not

become mandatory simply because the Wolf Recovery Plan is incorporated by reference

into a mandatory Forest Plan standard."  (Doc. No. 67, at 32-33.)  The court agrees that

while the standard of the 2004 Forest Plan is mandatory, that standard, by deferring to the

Wolf Recovery Plan, simply requires *consideration* of a *guideline* to "[c]lose temporary

and low standard roads as soon as their intended purpose has been achieved."  Under the

correct understanding of S-WL-4, Plaintiffs have not shown that the Service did not

properly consider closing such roads.

   In any event, Plaintiffs' argument that the proposed Alternative selected by the

Project would increase by several fold the number of miles of low standard roads and

trails open to ATV/OHMs under the No Action alternative is premised on a typographical

error.  As simple arithmetic discloses, the total number of miles of such travelways under

the No-Action Alternative is not "71" as stated in the relevant table, but rather "715,"

such that the alternative selected by the Forest Service does not represent a "sevenfold"

increase, but rather represents a decrease of almost 200 miles to 528 miles of such

travelways.

   Nevertheless, Plaintiffs argue that "[n]otwithstanding this typographical error, the

Project still violates S-WL-4 because the TMP makes permanent many miles of

temporary and low standards roads through designation." (Doc. No. 66, at 42-43.) This argument, however, rests on the premise that this Court already has rejected–that is, that the No-Action Alternative must be understood to include the decommissioning (or closure) of all unclassified roads. Furthermore, Plaintiffs have not established that any of the unclassified roads that the Project now designates were temporary or low standard roads, much less former temporary roads no longer in use. Granted, the definitional section of the Forest Service Manual provides "unclassified roads on each National Forest have evolved over the decades, and are *mainly* old Forest Service temporary roads that were never properly decommissioned or 'legacy' roads built in the past for timber access and abandoned by the original owner." (FWS0002615 (emphasis added).) But that statement with respect to all National Forests in general hardly establishes that the particular unclassified roads on the SNF that were designated by the Project here are in fact such former temporary roads.

### 2.     S-TS-3 and Closing Temporary Roads

Similarly, Plaintiffs also contend that the Project violates Forest Plan Standard S-TS-3, which requires that '[a]s soon as access use is completed, [the Service will] stabilize temporary roads and effectively close them to motorized traffic.'" (Doc. No. 54, at 45.) Plaintiffs argue that the Project "does not effectively close temporary roads after access use is completed." (Doc. No. 66, at 45.) Plaintiffs' position rests on their understanding that "most unclassified roads are temporary roads that were not decommissioned," that is, that "temporary roads are a subset of unclassified roads." (Id.

16

at 45, 44.)  But again, Standard S-TS-3 (similar to the guideline in the "Wolf Recovery

Plan" that is referenced in S-WL-4 and directs the Service to "[c]lose temporary and low

standard roads as soon as their intended purpose has been achieved") only applies to

temporary roads that are no longer used.  The relevant portion of the Project at issue,

however, addresses "unclassified roads."  And as explained with respect to S-WL-4,

Plaintiffs have not shown that the unclassified roads that the Project designates for use on

the SNF are in fact such former temporary roads.

### 3.    S-WL-2: Lynx Habitat and Snowmobile Use

Forest Plan Standard S-WL-2 prohibits any "net increase in groomed or designated

over-the-snow trail routes unless the designation effectively consolidates use and

improves lynx habitat through a net reduction of compacted snow areas."  (Forest Plan at

2-30.)  Plaintiffs allege that the Project violates Standard S-WL-2 because it will increase

the number of trails used by snowmobiles in the SNF, particularly in habitats of the

Canada lynx, and "there is no evidence the Project consolidates use and improves lynx

habitat."  (Doc. No. 54, at 42, 43.)  While Plaintiffs recognized that the Forest Service is

not "explicitly designating trails for snowmobiles," they contend that the Service "is

aware that snowmobiles utilize ATV trails, unclassified roads, ineffectively closed

temporary roads, and snow-covered system roads."  (Id. (citing FWS4162 (noting that "it

is legal for snowmobilers to access a recently closed road")).)  Plaintiffs also contend that

the Project "would construct 2.5 miles of additional ATV/OHM trail."  (Id.)

Defendants contend that Plaintiffs' position is untenable because "the Project

simply is not adding groomed or designated over-the-snow trail routes." (Id.)

Defendants further contend that Plaintiffs' argument is internally inconsistent because "if

one assumes – as Plaintiffs do – that snowmobilers use all routes regardless of

designation, the Project actually decreases the number of routes snowmobilers may use."

(Doc. No. 61, at 38.)  "While the Project overall opens 46 miles of trail to OHV use (2.5

miles of new trail, and the remainder existing dogsled and snowmobile trails now opened

to certain OHVs), it decommissions 157 miles of road – a net *decrease* of 111 miles."

(Id. (emphasis in original).)  Finally, although Plaintiffs note that snowmobiles "will still

use" trails "that are not groomed or designated as snowmobile trails" (Doc. No. 54, at 42),

the FWS's biological opinion observed that "road closures must be performed so as to

effectively eliminate snowmobile use" and the Project's requirement of "'effective' road

closures or obligation," along "with monitoring guidance, will ensure minimization of

effects." (FWS4162.)  And as noted above, the publication of the new map designating

particular roads and trails only for specified uses will prohibit any undesignated use.

Plaintiffs claim Defendants thus merely "champion form over substance" as the

Forest Service knows "that snowmobiles utilize ATV trails, unclassified roads,

ineffectively closed temporary roads and now-covered system roads," and "is facilitating

the increase in snowmobile trails by increasing the amount of trails snowmobiles can (and

will) use." (Doc. No. 66, at 42.)  Plaintiffs contend that Defendants ignore that the

Proposed Action "would create 46 miles of '[n]ew ATV trails and dogsled & snowmobile

trails proposed to allow ATV/OHM traffic,'" while under the No Action alternative

"there would be zero miles of the same trails." (Doc. No. 66, at 42.)

Defendants argue that Plaintiffs simply "continue to misunderstand the Project and its implications for snowmobiles." (Doc. No. 67, at 32.) "The Project does not increase the number of groomed over-snow trail routes" and "does not increase (or in any way affect) the number of miles of trails of any sort that are legally available for snowmobile use in the SNF." (Id.) The Court finds that Plaintiffs have failed to meet their burden to show that the Project would result in a "net increase of in groomed or designated over-the-snow trail routes ." The 46 miles of trails on which Plaintiffs focus are not new snowmobile trails, but "[n]ew ATV trails and [existing] dogsled [and] snowmobile trails proposed to allow ATV/OHM traffic." (FF0004051-52.) And once the new system is put in place and the map of designated uses is published, any use not in compliance with the map's designations, including snowmobile use anywhere other than on designated trails, will be prohibited.

### 4. S-WL-12 and Erosion

Finally, Plaintiffs allege that the Project violates Forest Plan Standard S-WL-12 because it will result in erosion that will cause degradation of natural resources. (Doc. No. 54, at 44.) Under Forest Plan Standard S-WL-12, a Standard for Aquatic Communities,

> [w]here management activity is causing or may cause active bank erosion
> that is expected to contribute to a reduction in water quality and degradation
> of aquatic habits, [the Service will] construct stabilization structures, plant
> vegetation, or otherwise manipulate vegetation to eliminate or minimize soil
> erosion while protecting and improving lakeshore or streamside
> environments and riparian habitats.

(Forest Plan, at 2-36.)  Plaintiffs note that they submitted comments purportedly documenting "resource damage from motorized use of roads and trails."  (Doc. No. 54, at 44.)

The Court is simply unable to evaluate this argument.  Claiming to have submitted comments on this issue, Plaintiffs cite to numerous pages in the record, but the Court is unable to discern how those comments relate to S-WL-12, particularly its focus on "active bank erosion."  And while Defendants claim to have responded to these comments, they simply cite to an eight-page stretch of the record without explaining how the dozens of agency responses reflected on those pages (identified as responses to certain numeric designations, e.g., "Response to 5-22") correlate to any of the five Forest Roads that Plaintiffs reference.  And none of the materials in the record to which either party cites expressly reference S-WL-12 or "active bank erosion."  It is Plaintiffs' burden to prove their point and they have failed to do so.

## D.    The NEPA Claims

As noted above, NEPA imposes procedural requirements on agency actions that have environmental impacts.  "The statute's purpose is to 'insure a fully informed and well-considered decision, not necessarily a decision the judge of [this court] would have reached had they been members of the decisionmaking unit of the agency.'"  <u>Sierra Club v. Kimbell</u>, 623 F.3d 549, 559 (8th Cir. 2010) (quoting <u>Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.</u>, 435 U.S. 519, 558 (1978)).  Moreover, "NEPA does not prevent agencies from taking environmentally harmful action, for as long as 'the adverse

environmental effects of the proposed action are adequately identified and evaluated, the

agency is not constrained by NEPA from deciding that other values outweigh the

environmental costs.'"  Id. (quoting Robertson v. Methow Valley Citizens Council, 490

U.S. 332, 350 (1989)).  "The statute requires 'only that the agency take a 'hard look' at

the environmental consequences before taking a major action.'"  Id. (quoting Baltimore

Gas & Elec. Co. v. NRDC, Inc., 462 U.S. 87, 97 (1983)).  Under NEPA, whenever an

agency such as the Forest Service proposes to take "major Federal actions significantly

affecting the quality of the human environment," the agency must prepare an

Environmental Impact Statement (EIS), that is, a "detailed statement" on various

specified factors.  42 U.S.C. § 4332(C).

Here, Plaintiffs argue that the Forest Service violated NEPA when it concluded

that it need not prepare an EIS.  (Doc. No. 54, at 31.)  Plaintiffs also argue that even if a

full EIS was not required, "the EA prepared by USFS is inadequate."  (Id. at 39.)  Finally,

Plaintiffs contend that regardless of whether an EA was sufficient or an EIS was required,

the Forest Service violated NEPA by failing to analyze a reasonable range of alternatives.

(Id. at 40.)

## 1.    Necessity of an EIS

In the DN/FONSI, the Forest Supervisor concluded that an EIS "will not be

prepared" because the selection of Alternative 2 Modified would "not have a significant

effect on the quality of the human environment considering the context and intensity of

impacts."  (DN/FONSI, at 39 (FF0004853).)  This Court must affirm the Forest Service's

decision to not prepare an EIS if "the Service took a 'hard look' at the project, identified the relevant areas of environment concern, and made a convincing statement for its FONSI.'"   Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 809 (8th Cir. 1998).

Plaintiffs contend that "it is *undisputed* that the Project will have site-specific impacts upon the BWCAW – through noise, water pollution, air pollution, and other impacts that will clearly change the nature of the wilderness experience," but without any support for such an assertion.  (Doc. No. 54, at 35 (emphasis added).)  And while they claim that they "went into great detail documenting in the record the current problems with short roads from the main road that run right up the wilderness boundary, causing illegal motorized intrusions into the Wilderness," they simply cite a twenty-two page stretch of the record consisting of a portion of Plaintiffs' July 2008 specific comments on the Project's proposed designations of numerous roads near the BWCAW.  (Id.)  Plaintiffs' comments do not, however, establish undisputed facts.  They further contend that the "Project has impacts forest-wide and makes decisions about OHV use on about 600 miles of roads" and that OHV use impacts many resources (water quality, wildlife, spread of invasive species)," but again without any supporting factual citation.  (Id.)

Plaintiffs complain that the Forest Service nonetheless "relied on a simple EA, declining to perform an EIS" even though "[o]ther national forests have prepared full EISs for such projects."  (Id. (proceeding to then cite several cases regarding either other national forests or different projects on the SNF, such as clearcutting directly adjacent to the BWCAW and timber sales).)  This argument entirely fails to address why an EIS was

purportedly necessary for this Project on the SNF.  While such cases might provide

relevant guidance here in terms of basic legal principles, they do not explain why this

Project required an EIS.

Defendants assert that no EIS was required because the Forest Service concluded

that the Project actually will result in a minor *benefit* to the environment.  (Doc. No. 61, at

30.)  In support, Defendants rely in substantial part on their assertion that the Project

"constructs no new roads and only 2.5 miles of new trails."  (Id. at 31.)  "*The Project*

*reduces mileage open to public motorized use on the Forest by 108 miles*.  Moreover,

there would be slightly less mileage of road and trail open to all OHVs after the Project

(1075 miles) as compared to no action (1138)."  (Id. (emphasis in original).)

In response, Plaintiffs contend that the claim of an environmental benefit "is a

faulty thesis based upon defendants' failure to analyze a realistic, legal "No Action"

alternative."  (Doc. No. 66, at 38 (emphasis in original).)  In other words, Plaintiffs argue

that the Forest Service's error in not understanding that certain unclassified roads would

have to be decommissioned–independently of any action alternative it might take–also

contaminates the Service's decision to not prepare an EIS.  But the Court already has

addressed Plaintiffs' inaccurate position regarding the decommissioning of all

unclassified roads under the "No-Action" alternative.

### 2.    Adequacy of the EA

Plaintiffs further argue the EA actually prepared by the Service "fails to adequately

analyze the direct, indirect, and cumulative effects of the Project."  (Doc. No. 54, at 40.)

In support, they cross-reference their argument that the Project violates the Wilderness Act.  (Id.)  Citing a single "exemplary" passage from the record, they further contend, somewhat ironically, that the Service's analysis is too "vague and conclusory" to satisfy NEPA's standard of a "hard look."  (Doc. No. 66, at 38-39.)

But as Defendants point out, Plaintiffs' argument is not directed at the proper portion of the EA.  (Doc. No. 67, at 31-32.)  The passage cited by Plaintiffs is from a section of Chapter 1 identifying certain issues.  (FF0003989.)  Plaintiffs fail to acknowledge that Chapter 3 of the EA, "Affected Environment and Environmental Consequences," devotes sufficient analysis, in this Court's opinion, to satisfy the "hard look" standard.  (FF0004014-80.)

Plaintiffs also argue that "defendants have failed to address the impacts of the project" because they improperly conclude that the chosen alternative would have a minor beneficial impact compared to the "faulty 'No Action' alternative."  (Doc. No. 66, at 39.) Thus, "[b]y setting up a straw man in the form of an unreasonably and illegally harmful 'No Action' alternative, defendants have attempted to avoid their duties under NEPA altogether."  (Id. at 40.)  But this Court already has rejected Plaintiffs' characterization of the No-Action Alternative.

In sum, Plaintiffs have not persuaded the Court either that the Defendants failed to take the requisite "hard look" or that the Forest Service's conclusion that the Project will have a slight environmental benefit is erroneous.

### 3.      Reasonable Range of Alternatives

NEPA and its implementing regulations require that an agency, when preparing an EA, "include brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b). Under Section 4332(2)(E), an agency shall "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E). And an agency "shall rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1508.14(a).  "This standard recognizes that a detailed statement of alternatives cannot as a practical matter 'include every alternative device and thought conceivable by the mind of man.'"  City of Bridgeton v. FAA, 212 F.3d 448, 455 (8th Cir. 2000).

Plaintiffs claim that the Service failed to include in its analysis any alternatives that prohibited motorized use within one mile of the BWCAW and reduced road density below the threshold established for the protection of the Canada lynx.  (Doc. No. 54, at 40-41; Doc. No. 66, at 41.)  Plaintiffs argue that the Service did not demonstrate that the Plaintiffs' proposed alternatives were "impracticable."  (Doc. No. 54, at 41; Doc. No. 66, at 41.)  Thus, they contend, the Forest Service "failed to include alternatives to address

these issues." (Doc. No. 66, at 41.)[9]

Defendants contend that the Service "clearly explained why Plaintiffs' proposals were rejected for further consideration." (Doc. No. 67, at 31.) The Court agrees. The EA included a section addressing "Alternatives Considered But Not Carried Forward For Detailed Study" (FF0004007), which discusses some nineteen proposed alternatives, including that no roads or trails be allowed near the BCWAW (id. at 4010), that were not considered further. With respect to road density and protection of lynx, Defendants note that one of the suggested alternatives that is addressed in "one or more of the alternatives considered in detail," was "[d]ecommission[ing] roads to protect wildlife." (FF0004013.) And the "Biological Assessment" performed for the SNF Project concluded that while Alternative 4 would provide the best protection for the lynx, that is, a reduction of road densities in ninety-six percent of Lynx Analysis Units (LAUs), Alternative 2 would still provide a reduction of eighty-three percent (whereas Alternative 3 would provide a reduction of only thirty percent). The Service thus considered the issue and, in light of the dual, and often conflicting, goals of both (1) "designating or decommissioning unclassified roads" and (2) "[p]roviding loop routes and connections for longer distance riding opportunities on existing roads and trails" for more enjoyable riding experiences, was not required to select the Alternative best suited to protection of the lynx. In sum,

---

[9]    Plaintiffs also reiterate their argument that the "no action alternative" presented by the Forest Service "has no basis in reality" because it fails to account for the fact that the temporary roads should have been decommissioned independent of whatever action the Service chose for the 2009 Project. (Doc. No. 66, at 41.) But again, the Court has rejected that argument.

Plaintiffs have shown no arbitrary and capricious action, abuse of discretion or violation of law by Defendants.

### E.     The ESA Claims

Plaintiffs allege six claims asserting violations of the Endangered Species Act (Counts VIII-XIII).  (Doc. No. 10, at 17-24.)  Defendants first contend that Plaintiffs have not advanced, in their motion for summary judgment, any argument with respect to Counts VIII, part of IX (that regarding the gray wolf), and X-XIII.  (Doc. No. 61, at 44 n.15.)  And Plaintiffs articulate no opposition to this point.  (Doc. No. 67, at 38 n.35 (noting Plaintiffs' lack of objection despite seeking relief with respect to the gray wolf).  Accordingly, Plaintiffs are deemed to have waived any argument with respect to those counts, and "waiver is 'deemed an abandonment of that issue.'"  Stanek v. Astrue, 2011 WL 6987177, *1 n.1 (D. Minn. Dec. 23, 2011) (quoting Jasperson v. Purcolator Courier Corp., 765 F.2d 736, 740 (8th Cir. 1985)), adopted 2012 WL 87326 (D. Minn. Jan. 11, 2012).[10]  Accordingly, the only ESA claim at issue is that portion of Count IX regarding the Canada lynx.

Under Section 7 of the ESA, federal agencies must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the

---

[10]     The Court recognizes that Jasperson was an appellate decision applying the waiver rule to appellate briefs and that such rule is based at least in part on Fed. R. App. P. 28(a).  Nonetheless, in Stanek, the district court applied the rule in the context of cross-motions for summary in a Social Security benefits action.  Here, too, the parties have cross-moved for summary judgment in an action seeking judicial review of agency action that was first subject to administrative appeals.

adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).  And if a

proposed agency action "may affect" a listed species or its critical habitat, the agency

must consult with the FWS.  Id.; 50 C.F.R. § 402.14(a)-(b).  Generally, the agency must

engage in a "formal consultation" with the FWS.  50 C.F.R. § 402.14(a).  But "if, as a

result of the preparation of a biological assessment under § 402.12 or as a result of

informal consultation with the Service under § 402.13," the agency "determines, with the

written concurrence of the Director, that the proposed action is not likely to adversely

affect any listed species or critical habitat," no formal consultation is required.  Id. §

402.14(b).  An "informal consultation" is "an optional process . . . designed to assist" a

federal agency such as the Forest Service "in determining whether formal consultation or

a conference is required."  Id. § 402.13(a).  If it is determined during the informal

consultation "that the action is not likely to adversely affect" a listed species or its critical

habitat, "the consultation process is terminated, and no further action is necessary."  Id.

With respect to that portion of Count IX regarding the Canada lynx, a species

listed as threatened under the ESA, Plaintiffs argue that the FWS violated the Endangered

Species Act by concurring with the Forest Service's Biological Assessment ("BA") and

its determination that the Project would not destroy or adversely modify critical habitat

for Canada lynx.  (Doc. No. 54, at 47-48.)  Plaintiffs argue that the FWS failed to

independently analyze the Project's impact on lynx critical habitat and relied instead on a

Forest Plan amendment that predates the designation of critical habitat for lynx.  (Id.  at

48.)

In July 2004, the FWS issued a programmatic biological opinion ("BiOp")
regarding the 2004 Forest Plan's effects on Canada lynx (among other species),
concluding that the Plan would not jeopardize the continued existence of the lynx.
(FWS0004164.)  The BiOp noted that, as of that time, "[n]o critical habitat has been
designated for [the lynx]; therefore, none will be affected."  (Id.)  The BiOp explained
that the 2004 Forest Plan "fully incorporate[s] the LCAS [Lynx Conservation Assessment
and Strategy] and tailor[s] it to conditions in northern Minnesota.  We concur that the
LCAS guidelines are sufficiently protective to ensure reproduction, numbers, and
distribution of lynx will not be appreciably reduced."  (Id.)

In February 2008, the FWS issued a proposed rule to designate critical habitat for
the Canada lynx.  In May 2008, the Forest Service submitted a BA to the FWS,
requesting that it concur that the project is not likely to adversely affect Canada lynx or its
critical habitat.  By letter dated June 3, 2008, the FWS concurred, "based on [the]
project's compliance with provisions set forth in" the 2004 SNF Forest Plan "that were
adapted from the Lynx Conservation Assessment and Strategy."  (FF0008590.)  The FWS
explained that the Project "reduces the accessibility of open roads throughout the Forest,
effectively reducing the impact of these roads."  (Id.)  Because "[o]pen road density will
decrease in virtually every affected Lynx Analysis Unit (LAU)," the lynx will benefit
from the reduction of "compacted snow routes in these LAUs."  (Id.)

In February 2009, the FWS issued its final rule designating five critical habitats for
lynx, with "Unit 2" apparently including the entire SNF.  74 Fed. Reg. 8616, 8670 (Feb.

25, 2009), 2009 WL 455111.  Then in July 2009, the FWS again informally concurred

with the Forest Service that the Project would not harm lynx or their critical habitat.

(FF0008775; FWS0001717.)  As the FWS Biologist explained to the Forest Service,

> [i]n respect to lynx critical habitat, since the proposed critical habitat was
> designated prior to completion of the action, and since you have indicated
> that no significant changes to the action have been made that would alter
> our [earlier] concurrence, you may consider this email as concurrence that
> this project may affect but is not likely to adversely affect lynx critical
> habitat.

(Id.)

Plaintiffs argue that the FWS based its concurrence with the Forest Service's

assessment on the Service's BA, but that the BA "improperly equated compliance with

the Lynx Amendment to the Forest Plan with the prohibition against adverse modification

of critical habitat under the ESA."  (Doc. No. 54, at 49-50.)  They contend that the NFMA

requires compliance with the Lynx Amendment, and while that compliance "may inform

the ESA inquiry, it may not replace it.  FWS is required to do an independent analysis and

make an independent finding under ESA section 7(a)(2) with regard to the Project's

impact on designated critical habitat.  Instead, the FWS concurrence simply equates

critical habitat with LAUs."  (Id. at 50.)  As Plaintiffs explain, "[w]hile there is overlap

between the LAUs under the Forest Plan, and lynx critical habitat under the ESA, there is

more critical habitat on the [SNF] than what is covered in the LAUs."  (Id. at 51.)[11]

---

[11]     Plaintiffs also contend that the "FWS continues to rely upon an illegal
regulation defining 'destruction or adverse modification' of critical habitat."  (Doc. No.
54, at 49.) They observe that three federal appellate circuits have invalidated that
definition in 50 C.F.R. § 402.02.  As the Ninth Circuit ruled in invalidating that

continue...

The ESA provides that an agency such as the Forest Service shall insure that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or results in the destruction or adverse modification of *habitat* of such species" determined "to be *critical*." 16 U.S.C. § 1536(a)(2) (emphases added). As several courts have noted, the focus thus must be on the relevant species' designated "critical habitat." E.g., Gifford Pinchot Task Force v. U.S. Fish and Wildlife

---

[11]...continue

definition, "the ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted," such that "conservation and survival" are "two different (though complementary) goals of the ESA." Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service, 378 F.3d 1059, 1070 (9th Cir. 2004). But the regulatory definition, "by contrast, finds that adverse modification to critical habitat can only occur when there is so much critical habitat lost that a species' very survival is threatened." Id.

After the Ninth Circuit's August 6, 2004 decision, the FWS issued a Memorandum on December 9, 2004, directing that FWS biologists "**not** cite to or use" the invalidated definition "at any point in the consultation process." (FWS0004205 (emphasis in original).) The Memorandum also provided a substituted analytic framework to be used "[u]ntil we have promulgated a new regulatory definition of 'destruction or adverse modification.'" (Id. at 4206.) It appears that the FWS has not yet promulgated any such new regulatory definition.

But that is of little concern because although Plaintiffs contend that the FWS "continues to rely upon" the invalidated definition in Section 402.02, the FWS's December 9, 2004 Memorandum expressly directed its biologists to the contrary. In addition, the February 2009 Final Rule designating the lynx's critical habitat likewise states that in light of the federal appellate decisions, "we do not rely on our regulatory definition when analyzing whether an action is likely to destroy or adversely modify critical habitat." 74 Fed. Reg. 8616, 8644. Rather, "[u]nder the Act, we determine destruction or adverse modification on the basis of whether . . . the affected critical habitat would remain functional (or retain the current ability for the PCEs to be functionally established) to serve its intended conservation role for the species." Id. If the FWS disclaims reliance on the invalidated definition, and "[n]othing in the biological opinion suggests otherwise," the Court must reject any argument that the FWS improperly relied on that regulation. Butte Environmental Council v. U.S. Army Corps of Engineers, 620 F.3d 936, 947 (9th Cir. 2010).

Service, 378 F.3d 1059, 1075-76 (9th Cir. 2004).

Here, however, the "critical habitat" for Canada lynx was not designated until February 25, 2009.  74 Fed. Reg. 8616, 2009 WL 455111.  Plaintiffs thus contend that the "FWS never conducted an independent inquiry into whether the Project would adversely modify critical habitat for lynx, but merely relies on [the Forest Service's] use of Lynx Analysis Units," which do not reflect the designated "critical habitat" for lynx.  (Doc. No. 54, at 51.)

In response, Defendants first contend that under the FWS's 1986 Final Rule establishing these procedural regulations, an agency's action "without adverse effects is not likely to result in the loss of *any* critical habitat, much less the loss of enough critical habitat to threaten the species' survival or recovery."  (Doc. No. 61, at 45 (emphasis in original).)  As the FWS explained when issuing the Final Rule, if the informal consultation process discloses that the agency's proposed action would "have beneficial, discountable, or insignificant effects upon listed species or their critical habitats," the agency action "could be deemed to be in compliance with section 7(a)(2) without formal consultation."  51 Fed. Reg. 19926, 19949.  Defendants thus contend that because the FWS adhered to the informal consultation framework, "no further ESA consultation or analysis was necessary."  (Doc. No. 61, at 45-46.)  They suggest that the analysis of the "destruction or adverse modification" issue is required only if the FWS conducts a formal, rather than an informal, consultation with the relevant agency.  (Doc. No. 61, at 50.)

It is not clear, however, that taking the informal, rather than the formal, consultation path eliminates the FWS's obligation to evaluate the impact of a Forest Service project on a listed species' "critical habitat." The ESA still requires that each agency shall insure that its actions are "not likely to . . . result in the destruction or adverse modification of habitat" of listed species. 16 U.S.C. § 1536(a)(2).[12] And even though it employed the informal method here, the FWS nevertheless provided its "concurrence that this project may affect but is not likely to adversely affect lynx critical habitat." (FWS0001717.) The issue here is whether the FWS's final concurrence in 2009, after the lynx's "critical habitat" was designated, is valid where it is based on the FWS's initial concurrence which occurred before the designation of "critical habitat" for lynx, such that the basis for that concurrence was not premised on any analysis of critical habitat.

In Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service, the Ninth Circuit addressed whether "late successional reserves" (LSRs), rather than the relevant species' designated "critical habitat," could be evaluated for purposes of Section 7 of the ESA. 378 F.3d 1059, 1070 (9th Cir. 2004). The forest plan at issue there had allocated the forest "into 'late successional reserves' (LSRs), 'matrix' lands, and 'adaptive management areas,' with different [tree] harvesting rules applied to each area" Id. at 1064. "About

---

[12]   If an agency determines that its action "may affect listed species or critical habitat," "formal consultation is required" unless a biological assessment or an informal consultation shows that the "proposed action is not likely to adversely affect any listed species or critical habitat." 50 C.F.R. § 402.14(a), (b). Thus, a determination that the action "is not likely to adversely affect" the lynx "or [its] critical habitat" must still be made in an informal consultation.

70% of the spotted owl's critical habitat falls within a LSR." Id. at 1064 n.2. The court ruled that although "there is overlap and complementation between critical habitat areas and LSRs," "LSRs cannot stand in for critical habitat within the meaning of the ESA." Id. at 1075.

> If we allow the survival and recovery benefits derived from a parallel habitat conservation project (the [forest plan] and its LSRs) that is not designated critical habitat to stand in for the loss of designated critical habitat in the adverse modification analysis, we would impair Congress' unmistakable aim that critical habitat analysis focuses on the actual critical habitat.

Id. at 1076. Plaintiffs thus attempt to draw an analogy between the LSRs at issue in Gifford Pinchot and the Lynx Analysis Units that the FWS initially employed here in the absence of a designated critical habitat. In Gifford Pinchot, however, the spotted owl was listed as threatened in 1990 and the FWS "delineated the critical habitat for the spotted owl in 1992." Id. at 1063. The Forest Service issued its forest plan for the relevant forest in 1994. Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1403-04 (9th Cir. 1996).

Here, in contrast, the Forest Plan was issued in 2004, well before any critical habitat had been designated for Canada lynx. There is little question that the FWS's initial concurrence in June 2008 was valid in light of the fact that no critical habitat had yet been designated. The issue is whether FWS's July 2009 concurrence, after that designation had been made, is valid where it largely defers to the pre-designation June 2008 concurrence.

Defendants argue that the FWS's concurrence was rational, and therefore should be upheld. (Doc. No. 61, at 46-51.) As Defendants explain, the Lynx Conservation

Assessment and Strategy (LCAS) was developed in 2000 (and amended in 2001 and twice in 2003) to provide protection for Canada lynx.  (Id. at 46.)  The LCAS designated Lynx Analysis Units to facilitate the assessment of the impact of proposed projects on lynx and their habitat.  (FWS0000513.)  The LCAS, which expressly acknowledges the obligations imposed by Section 7 of the ESA, explained that forest plans "that incorporate the LCAS's conservation measures and projects that implement them, are generally not expected to have adverse effects on lynx, and implementation of these measures across the range of the lynx is expected to lead to conservation of the species."  (FWS0000437.) "However, . . . project specific analysis and design also must be completed."  (Id.)

Here, the Forest Service incorporated the LCAS into the 2004 SNF Forest Plan, and designated 57 LAUs within the SNF.  (See generally 2004 Forest Plan, Appendix E.) The Plan stated that the "LCAS recommends both substantive and procedural guidance for lynx conservation management.  Applicable LCAS substantive guidance (such as requiring that certain amounts of habitat always be maintained) has been incorporated into the Forest Plan."  (Id. at E-6.)  The Plan explained that LAUs "are the smallest landscape scale analysis units upon which direct, indirect, and cumulative effects analyses for lynx will be performed."  (Id. at E-4.)  "LAUs are intended to provide the fundamental scale with which to begin monitoring and evaluation of effects of management actions on lynx habitat."  (Id.)

In Gifford Pinchot, the LSRs that the Forest Service sought to have "stand in for critical habitat" extended beyond the designated critical habitat.  378 F.3d at 1075-76.

The Ninth Circuit ruled that "[i]t matters not if there is worthwhile and possible suitable habitat outside of the designated 'critical habitat.'" Id. at 1076.  Here, in contrast, all of the LAUs at issue are within the SNF and thus also within the lynx's designated critical habitat.

The FWS's 2009 Final Rule designating critical habitat for lynx notes that the "LCAS constitutes the best available information on conserving lynx and identifies potential risk factors to lynx and lynx habitat and management guidance to reduce these risks." (74 Fed. Reg. 8616, 8624.)  That Rule also noted that "[l]ands covered by the LCAS are not being excluded from critical habitat designation.  The LCAS . . . assists Federal agencies in planning activities and projects in ways that benefit lynx or avoid adverse impacts to lynx and their habitats." (Id. at 8625.)  "If projects are designed that fail to meet the standards in the LCAS, the biologist using the LCAS would arrive at an adverse effect determination for lynx." (Id. at 8639.)

"When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements [PCEs] that are essential to the conservation of the species." 50 C.F.R. § 424.12(b).  PCEs are the "biological or physical" factors "that are essential to the conservation of the species," such as its feeding and reproduction sites.  Id.  Defendants assert that the PCEs identified in the wake of the LCAS but before the designation of lynx critical habitat "are identical to [the] PCEs utilized by [the] FWS in the 2009 final critical habitat rule." (Doc. No. 61, at 48 n.19.)

The 2009 Final Rule designating the critical habitat for the Canada lynx notes that

under Section 3 of the ESA, "critical habitat" is generally defined as "[t]he specific areas within the geographical areas occupied by a species . . ., on which are found those physical or biological features" that are "[e]ssential to the conservation of the species and" that "may require special management considerations or protection."  74 Fed. Reg. at 8634.  In "determining which areas . . . to designate as critical habitat," the FWS "consider[s] the physical and biological features that are essential to the conservation of the species and that may require special management consideration and protection.  We consider the physical and biological features to be the primary constituent elements (PCEs) laid out in the appropriate quantity and spatial arrangement for the conservation of the species."  Id. at 8635.  The Rule observed that "[s]pecial management direction for lynx" was developed by the LCAS "using the best available science at the time specifically to provide a consistent and effective approach to conserve lynx and lynx habitat on Federal lands."  Id. at 8638.

The 2009 Rule also provides that the FWS no longer relies

on our regulatory definition when analyzing whether an action is likely to destroy or adversely modify critical habitat.  Under the Act, we determine destruction or adverse modification on the basis of whether, with implementation of the proposed Federal action, the affected critical habitat would remain functional (or retain the current ability for PCEs to be functionally established) to serve its intended conservation role for the species.

74 Fed. Reg. at 8644.  This is the "key factor" related to this determination.  Id.

"Activities that may destroy or adversely modify critical habitat are those that alter the physical and biological features to an extent that appreciably reduces the conservation

value of critical habitat for lynx."  Id. (emphasis added).  Accordingly, the underlying

basis for the FWS's 2008 concurrence, to which the FWS adhered in its 2009

concurrence, is the same basis that would inform a formal critical habitat analysis for

purposes of Section 7 of the ESA.  In short, unlike the LSRs that the court in Gifford

Pinchot disallowed as a "stand in" for the spotted owl's designated critical habitat, the

LAUs of the 2000 LCAS are premised on the PCEs that guided the identification of the

lynx's critical habitat in 2009.

Plaintiffs' brief response–simply reiterating the point that compliance with the

LCAS is not compliance with the ESA, and relying again on their position that the Project

increases the miles of roads and trails–is largely unresponsive to Defendants' explanation.

Accordingly, Plaintiffs have not shown that the FWS's 2009 concurrence is somehow

invalid under the ESA or APA.

### F.    The Wilderness Act Claim

The Wilderness Act expressly prohibits, "*within* any wilderness area," certain

specified activities and forms of development, such as the "use of motor vehicles,

motorized equipment or motorboats," and permanent or temporary roads.  16 U.S.C. §

1133(c) (emphasis added).  Beyond this prohibitory mandate, it is far from clear how, if at

all, the Act purports to limit activities occurring *outside* of a designated wilderness area,

but possibly having environmental effects that extend into a wilderness area.

The Wilderness Act also generally directs that an agency administering a

wilderness area

> shall be responsible for *preserving the wilderness character of the area* and
> shall so administer such area for such other purposes for which it may have
> been established as also to preserve its wilderness character.  Except as
> otherwise provided in [chapter 23 of Title 16], wilderness areas shall be
> devoted to the public purposes of *recreational*, scenic, scientific,
> educational, conservation, and historical use.

16 U.S.C. § 1133(b) (emphases added).  Plaintiffs assert that the Project violates the

Wilderness Act because it will permit OHV use outside of the BWCAW that will

allegedly degrade the wilderness character of the BWCAW by increasing noise impacts,

degrading water and air quality, and increasing non-native invasive species ("NNIS").

(Doc. No. 54, at 14.)

The Court first observes that the Project is confined to that portion of the SNF that

lies outside of the BWCAW.  Motor vehicle use within the BWCAW is generally

prohibited, 16 U.S.C. § 1133(c), and the Project will not authorize any OHV use in the

BWCAW.  Plaintiffs' Wilderness Act claim thus relies on their contention that OHV use

outside of the BWCAW will nevertheless have negative impacts within the BWCAW.

The Court also observes that Section 1133(b), while directing that the responsible

agency preserve the wilderness character of a wilderness area, recognizes that wilderness

areas be devoted to several public purposes, including recreation, although it directs that a

wilderness area be administered for such purposes so as to "preserve [its] wilderness

character."  The Wilderness Act also expressly provides that it shall not "be deemed to be

in interference with" other federal laws such as the "Multiple-Use Sustained Yield Act of

June 12, 1960."  16 U.S.C. § 1133(a)(1).  That Act provides that the national forests

"shall be administered for outdoor *recreation*, range, timber, watershed, and wildlife and

fish purposes."  16 U.S.C. § 528 (emphasis added).

Thus, the question is whether, and to what extent, the Wilderness Act prohibits otherwise permissible recreational activities occurring within the SNF that, however, purportedly interfere with the preservation of the BWCAW's "wilderness character."  The statute does not define either "preserve" or "wilderness character," but does define "wilderness" as an area, "in contrast with those areas where man and his own works dominate the landscape," "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain," and

> an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

In Izaak Walton League of America, Inc. v. Kimbell, the court addressed whether the Forest Service's decision to construct a snowmobile trail "along a route that is adjacent to the" BWCAW violated the Wilderness Act, the BWCAW Act, and other federal statutes.  516 F. Supp. 2d 982, 984 (D. Minn. 2007).  The court stated that "the plain language of § 4(b) makes no distinction based on the source of the allegedly degrading agency activity."  Id. at 988.  "[T]he agency's duty to preserve the wilderness is wholly independent of the source or location of that activity."  Id.  Thus, the court

expressly held "an agency's duty to preserve the wilderness character under §4(b) . . .

may apply to agency activity that occurs outside of the boundaries of the wilderness

area." Id. at 989.

Plaintiffs appear to approach the issue of preservation of wilderness character in a

literal and absolute fashion–that is, that any Forest Service action, such as the

reconfiguration of the OHV roads and trails on the SNF proposed by the Project, that

results in any increase in noise entering into the BWCAW, any increase in non-native

invasive species, or any diminishment of water and air quality, "degrades" the wilderness

character of the BWCAW so as to violate the Wilderness Act.  They argue that "[i]mpacts

to the BWCAW need not be significant to establish a violation of the Wilderness Act;

rather, the impacts need only degrade wilderness character of the BWCAW to violate the

Wilderness Act."  (Doc. No. 54, at 14.)

For example, with respect to noise impacts, Plaintiffs argue that the Project will

increase the noise entering the BWCAW due to the concentration and increased

frequency of OHV users on loops within close proximity to the BWCAW.  (Doc. No. 54,

at 16.)  They contend that the Service's analysis of noise impacts, while acknowledging

that noise levels generally increase with traffic intensity, ignores evidence of record, and

contains faulty and misleading assumptions regarding noise impacts.  First, Plaintiffs

claim the Service relies on only an average noise level of motor vehicles that "necessarily

understates the actual impacts" of such vehicles, contending that the Service "must assess

the maximum noise impacts" on the BWCAW.  (Id. at 17.)  Second, they claim this

41

"failure is even more egregious in light of the fact that the Service unreasonably and

exclusively restricts its analysis of wilderness character to 'specific routes and campsites

where visitor presence is likely,'" even while recognizing that those seeking solitude will

disperse off of common and established routes such that "'there could be a few isolated

occurrences where' such people 'would see and hear more sights and sounds than they

would expect to within a wilderness.'"  Id.[13]

        But in Izaak Walton League, the court was "not persuaded that § 4(b) supports a

per se ban on agency activity that has any impact on the adjoining wilderness."  516 F.

Supp. 2d at 989.  A "per se ban on all agency activity having some impact on the

adjoining wilderness area would substantially impede its administration of wilderness

areas, and could serve to expand the wilderness boundaries beyond the areas established

by Congress."  Id.  "[A]t some point, the wilderness stops and civilization begins."  Id.

        In its decision on the Project, the Forest Service noted that its "decision results in a

decrease in the number of OHV routes within one mile of BWCAW travel routes (lakes

and rivers) and BWCAW campsites."  (FF0004842.)  The decision observed that

"[a]nalysis in the [EA] determines that none of the alternatives would cause noise of a

different type or quality, nor would the noise be more constant or frequent, than what

already exists on public and private roads adjacent to the wilderness boundary."  (Id.)

The EA also "determine[d] that none of the alternatives would degrade the natural

---

        [13]     Plaintiffs also assert that Defendants' position is undermined by Plaintiffs'
argument that the No-Action Alternative would decommission certain roads.  (Doc. No.
66, at 22.)  The Court previously has addressed the lack of merit to Plaintiffs' argument
regarding the No-Action Alternative.

character of the wilderness ecosystem." (<u>Id.</u>)  The Service explained that "five aspects"

of the Project led to the conclusion that it would "not have a significant effect to the

wilderness": (1) "fewer low standard roads within one mile of the wilderness, and no

new roads or trails will be constructed within one mile"; (2) "a shift of OHV use to

locations further away from the wilderness"; (3) "[a]dditional OHV use will be primarily

on existing roads open to all vehicles"; (4) with respect to sounds, "the very minor impact

that additional motor use will have from use on existing roads"; and (5) "decisions to

close roads can be implemented to have very effective results."  (FF0004855.)  The

Service concluded "that low standard roads being closed within one mile of the

wilderness . . . will decrease air quality pollutants entering the wilderness, sounds

entering the wilderness, decrease potential water quality impacts to the wilderness,

decrease potential impacts to wildlife and decrease the potential for NNIS spread into the

wilderness."  (FF0004858.)

The Service's analysis of these factual and scientific issues is plainly within its

particular technical expertise and "is properly left to the informed discretion of the

responsible federal agencies."  <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976).

Plaintiffs have failed to meet their burden of establishing any arbitrary or capricious

action, abuse of discretion or violation of law.

## G.     The Executive Orders and Minimization Regulation Claims

Plaintiffs have alleged two claims for "[v]iolation[s] of Executive Orders and

Forest Service Regulations," one for an alleged "[f]ailure to Minimize Resource Impacts"

(Count VI), and one for an alleged "[f]ailure to Identify the Minimum Road System" (Count VII).  (Doc. No. 10, at 14, 16.)  With respect to Count VI, Plaintiffs rely on Executive Order No. 11644 (Feb. 8, 1972), as amended by Executive Order No. 11989 (May 24, 1977), as well as on 36 C.F.R. § 212.55(b), a federal regulation establishing what are known as "minimization criteria."  (Doc. No. 10.)  With respect to Count VII, Plaintiffs rely on 36 C.F.R. § 212.5(b).[14]

### 1.   Enforceability of Executive Orders

Defendants first contend that in the Eighth Circuit there is no private cause of action to enforce these executive orders because there is no evidence that they were "intended to create a private right of action."  (Doc. No. 61, at 25 (quoting Indep. Meat Packers Ass'n v. Butz, 526 F.2 228, 236 (8th Cir. 1975) (explaining that Order at issue did not "expressly grant [a private right of action]" and that "[t]o infer a private right of action here creates a serious risk that a series of protracted lawsuits brought by persons with little at stake would paralyze the rulemaking functions of federal administrative agencies")).)  The Court need not resolve that precise issue, however, because Plaintiffs are not alleging any violation of a particular requirement of either Executive Order that is not also articulated as a regulation.

The 1972 Executive Order directed agencies such as the Forest Service to develop

---

[14]      Plaintiffs, however, have not briefed any argument with respect to Count VII.  Accordingly, Plaintiffs are deemed to have waived any argument with respect to this counts, and "waiver is 'deemed an abandonment of that issue.'"  Stanek v. Astrue, 2011 WL 6987177, *1 n.1 (D. Minn. Dec. 23, 2011) (quoting Jasperson v. Purcolator Courier Corp., 765 F.2d 736, 740 (8th Cir. 1985)), adopted 2012 WL 87326 (D. Minn. Jan. 11, 2012).

and issue regulations that, among other things, designated areas and trails for the use of

off-road vehicles "based upon the protection of the resources of the public lands," and

that such designations be in accordance with certain criteria.  Executive Order No. 11644

(Feb. 8, 1972).

Pursuant to this directive and other legal authority, the Forest Service issued such

regulations requiring agency officials to "consider effects on the following, with the

objective of minimizing":

> (1) Damage to soil, watershed, vegetation, and other forest resources;

> (2) Harassment of wildlife and significant disruption of wildlife habitats;

> (3) Conflicts between motor vehicle use and existing or proposed uses of National Forest System lands or neighboring Federal lands; and

> (4) Conflicts among different classes of motor vehicle uses of National Forest System lands or neighboring Federal lands.

> In addition, the responsible official shall consider:

> (5) Compatibility of motor vehicle use with existing conditions in populated areas, taking into account sound, emissions, and other factors.

36 C.F.R. 212.55(b) (the "minimization criteria").  As this Court understands Plaintiffs'

argument, Plaintiffs allege only violations of Section 212.55(b), not also any requirement

of the Executive Orders that is not likewise imposed by duly-promulgated regulations.

Accordingly, the Court need not determine whether any aspect of the Executive Orders

that is not reflected in the regulations is enforceable through a private cause of action.

### 2.      Minimization Criteria

As Defendants point out, at least one federal court has ruled that these criteria do

"not mandate minimization of environmental damage," but rather only "lend guidance"

towards maintaining "the regulations objectives."  Priors Coalition v. Weldon, 803 F.

Supp. 2d 1184, 1195 (D. Mont. 2011) (emphasizing that regulations provide that the

agency "official shall **consider the effects** on" certain environmental factors "with the

**objective** of minimizing" certain negative outcomes) (emphases added by Weldon).  And

"[w]here a regulation does not require action or create a compulsory duty on behalf of the

agency, a plaintiff cannot compel agency action."  Id.

     This Court agrees in part.  The regulation does not mandate that agency action

minimize the particular negative outcomes; it mandates that the agency "consider" the

effects of agency action, "with the objective of minimizing" certain negative outcomes.

Thus, the minimization criteria do impose a mandate of sorts, but not one that mandates

particular measurable results.  The Forest Service itself appears to agree with this

assessment.  The 2005 Travel Management Rule explains that Section 212.55(b) "is

mandatory with respect to addressing environmental and other impacts associated with

motor vehicle use of trails and areas," noting that the intent of the Executive Order was to

"manage" motor vehicle use, "but that motor vehicle use on Federal lands continue in

appropriate locations."  70 Fed. Reg. 68264, 68281, 2005 WL 2986693.  This is

consistent with the overall policy of multiple–and often conflicting–uses on the SNF.  As

the Travel Management Rule further explains, "[a]n extreme interpretation of 'minimize'

would preclude any use at all, since impacts always can be reduced further by preventing

them altogether.  Such an interpretation would not reflect . . . [the] laws and policies

related to multiple use of NFS lands." Id.  In other words, the "minimization criteria" only require that the Forest Service considers certain environmental factors, but does not require it to ignore permissible recreational uses in order to eliminate certain negative environmental impacts.

This understanding of the regulation is not inconsistent with Plaintiffs' claim. Plaintiffs argue that the Forest Service, while stating in a conclusory fashion that it applied the minimization criteria, did not "in fact" properly "consider and apply" the criteria.  (Doc. No. 66, at 30.)  Plaintiffs do not so much contend that the Forest Service in fact violated the regulatory requirement, but rather that they have not demonstrated in the administrative record that they complied with that requirement.  (Id. at 32 ("Defendants fail to appreciate the difference between saying they complied with 36 C.F.R. § 212.55(b) and showing that they complied with 36 C.F.R. § 212.55(b).").)

In addition, Plaintiffs' argument is directed only at the Service's actions with respect to "trails," not "roads."  (Doc. No. 66, at 32-36.)  This is consistent with the plain language of the regulation, because the minimization criteria of Section 212.55(b), addressing "specific criteria," impose a duty on the Forest Service only with respect to "trails and areas on National Forest System lands."  36 C.F.R. § 212.55(b).  This limit is no oversight or definitional disjunction because the requirements of Section 212.55(a), regarding "general criteria," expressly apply not only to "trails" and "areas," but also to "roads."  Id. § 212.55(a).  Finally, the regulation involves one additional limitation:  it only applies to the "*designation* of trails and areas," not to other Forest Service actions

such as "decommissioning" trails.  And as Defendants contend, "[t]he bulk of the [Project] does not designate trails or areas."  (Doc. No. 61, at 27.)

The Court agrees that the vast majority of actions proposed by the Project concern the various types of *roads* found on the SNF.  (FF00004827 (providing table of various aspects of the decision in terms of (1) changes to roads, (2) changes to trails, and (3) changes to unclassified roads).)  The Project makes significant changes to permissible uses on SNF roads (e.g., opening 187 miles of road previously open only to highway licensed vehicles to also permit use by all vehicles, including OHVs).[15]  But with respect to trails, it constructs only 2.5 miles of new trails, and co-designates only 43 miles of existing trails previously designated for snowmobile or dogsled use as also appropriate for ATV/OHM use.  (Id.)  And with respect to existing unclassified roads, the Project would convert only 14 miles to motorized trails, and only 0.6 miles to hiking trails.  (Id.)

Thus, the fact that the Forest Service arguably did not expressly address the requirements of Section 212.55(b) at great length–at least in comparison to its treatment of other issues pertaining to roads–is not particularly indicative of reversible error.  Moreover, Plaintiffs' present argument suffers from a more decisive defect–they did not raise this issue in their administrative appeal.  The joint appeal by Plaintiffs (as well as several other organizations) enumerated six major issues, but none of them addressed the

---

[15]     The Project notes that there are "almost 1600 miles of roads currently open to OHVs" and that the proposed action would impact "about 596 miles" of such roads. (FF0004826.)

minimization criteria of 36 C.F.R. § 212.55(b).[16]   Accordingly, this Court lacks

jurisdiction to review that issue now.  7 U.S.C. § 6912(e) ("[A] person shall exhaust all

administrative appeal procedures established by the Secretary or required by law before

the person may bring an action in a court of competent jurisdiction against . . . an agency,

office, officer, or employee of the Department."); 36 C.F.R. § 215.21 (stating

departmental position "that any filing for Federal judicial review of a decision subject to

appeal is premature and inappropriate unless the plaintiff has first sought to invoke and

exhaust the appeal procedures in [Part 215 of Title 36, C.F.R.]."); National Crop Ins.

Servs., Inc. v. Fed. Crop Ins. Corp., 351 F.3d 346, 349 (8th Cir. 2003) ("All administrative

appeals established by the Secretary of Agriculture must be exhausted before a lawsuit

may be brought against an agency of the USDA."); Sierra Club v. Bosworth, 352 F.

Supp.2d 909, 915-16 (D. Minn. 2005).

## III.   CONCLUSION

The Court finds that Plaintiffs have failed to meet their burden to show that

Defendants' decision to implement Alternative 2 Modified was arbitrary and capricious,

an abuse of discretion, or otherwise contrary to law under the APA.  Accordingly, the

2009 Project does not violate any of the federal statutes on which Plaintiffs rely.

---

[16]     Plaintiffs argued that the Service violated the Travel Management Rule by making temporary and user-created routes permanent without considering the availability or resources for monitoring and enforcement, as required by Section 212.55(a). (FF0013636.)  But that provision and requirement is distinct from the "minimization criteria" on which Plaintiffs now attempt to premise their argument in this Court.

IV.     **ORDER**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Plaintiffs' motion for summary judgment [Doc. No. 44] is **DENIED**; and

2.      Defendants' motion for summary judgment [Doc. No. 60] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   April 12, 2012                                      s/ Susan Richard Nelson
                                                   SUSAN RICHARD NELSON
                                                   United States District Judge